**Vincin CAMPISE**

v.

**J. W. HAMILTON, Sheriff, Brazos County, et al.**

**Civ. A. No. 72–H–239.**

United States District Court,
S. D. Texas,
Houston Division.

Aug. 9, 1974.

R. Earl Lord, Houston, Tex., for plaintiff.

Steven C. Oaks, Houston, Tex., for defendants.

## MEMORANDUM OPINION

SINGLETON, District Judge.

This is a civil rights suit brought by a state prisoner against his jailor under the provisions of 42 U.S.C. § 1983. Plaintiff seeks damages upon the claim that defendant, under color of law, deprived him of his constitutionally protected right to be free of cruel and unusual punishment. This court has jurisdiction under the provisions of 28 U.S.C. § 1343. When originally filed,[1] the suit was treated as a petition for writ of habeas corpus. Plaintiff then filed an amended complaint in which he asserted two causes of action. The first is the cause of action presently before the court. The second cause of action sought release from his present confinement in the Texas Department of Corrections upon a writ of habeas corpus.

By memorandum and order dated October 3, 1972, the habeas corpus action was dismissed on the ground that his state remedies had not been exhausted, plaintiff's pending motion to enjoin defendants from censoring mail between plaintiff and his attorney was granted, and the civil Rights portion of the complaint was set for trial.

In the meantime plaintiff, following the procedure set out in Article 11.07, Vernon's Ann.C.C.P., filed his application for writ of habeas corpus in the state convicting court. Before the trial was had in this court on the civil rights claim, the state court held an evidentiary hearing on the habeas claim. The attorneys for both sides stipulated that the testimony that would be offered in this court would for the most part duplicate that already adduced in the state habeas hearing. The statement of facts in the habeas hearing was introduced into evidence in this trial. Therefore, in addition to the evidence produced at the civil rights trial, the findings and conclusions of this court are based on the admissions of the parties and the testimony adduced at the state habeas hearing.

## FACTS

Plaintiff was arrested on February 14, 1970, on the felony charge of murder. He was placed in the custody of defendant, J. W. Hamilton, then sheriff of Brazos County. Plaintiff remained in the custody of Sheriff Hamilton and in the Brazos County jail until the date of his trial on July 29, 1970. On at least one occasion plaintiff was placed in

---

1. Plaintiff filed a pro se complaint February 25, 1972, as a civil rights suit under 42 U.S.C.A. § 1983. In addition to his allegations concering his treatment while confined in the Brazos County jail, he alleged that his plea of guilty to the offense of murder was coerced by reason of such treatment and other actions of his court-appointed attorneys and the sheriff. By order dated April 6, 1972, this court stated:

"Plaintiff's complaint is styled a § 1983 Civil Rights action, but in large part it seeks relief appropriate for a habeas corpus petition. This court will, therefore, treat this complaint at least temporarily as a petition for habeas corpus and will appoint . . . an attorney of this court . . . to represent petitioner."

the solitary cell of the Brazos County jail for a period of at least three days.[2]

Plaintiff contends that his solitary confinement as administered by the Brazos County jail constituted cruel and unusual punishment as forbidden by the eighth amendment. For the reasons that follow, this court determines that the conditions of plaintiff's solitary confinement were so violative of basic concepts of decency as to constitute cruel and unusual punishment.

### THE SOLITARY CELL

The physical conditions of the cell are for the most part uncontroverted. The cell is made completely of concrete. It measures six feet by six feet with a ceiling eight feet high. There are two small windows in the one door. There is one light, controlled from the outside. There is no commode, no washbasin, no bed, no chairs, no running water. There is nothing in the cell but a small drain in the middle of the floor through which body waste can be flushed with the aid of a water hose which is operated by trusties. The prisoner is made to sleep on the concrete floor. If requested, he may be supplied a blanket.

As far as personal hygiene is concerned, the prisoner is given no soap, no towel, no toilet paper. Neither is he given toothbrush, toothpaste, or comb. There are no facilities for shaving. There are no facilities for cleaning either himself or his cell. According to the testimony of the sheriff and his two deputies, the body-waste hole in the cell was flushed out with the aid of a water hose "when needed." Although the

person confined in the cell did not have access to the water hose, he could request that a trusty flush the hole. Asked how often the cell was washed, Deputy Sheriff Yeager answered that as a general practice "it depended upon the individual who was in there. If the sanitary condition got bad, in a deteriorated state, it was washed up."[3] Plaintiff testified that the cell was never cleaned while he was confined there, that the floor was filthy, and that he had to lay around and smell his own waste. Two other inmates of the jail, one who spent twenty-nine consecutive days in solitary and the other who spent three, testified that the solitary cell was never cleaned while they were confined there.

As a general practice, a person in solitary in the Brazos County jail at the time of the plaintiff's confinement was placed on a restricted diet of but one meal a day, at noon, and a plastic gallon jug of water. Plaintiff's once-a-day meal consisted of a baloney sandwich.[4]

Plaintiff alleges he suffered a severe weight loss as a result of his "starvation diet." He alleges that he weighed approximately 160 pounds when he was placed in the county jail and that he weighed 130 pounds when transferred to the Texas Department of Corrections. Although two pictures of plaintiff that were introduced into evidence (one of which was taken thirty days prior to his confinement, but is only a bust picture) appear to corroborate his allegation, the evidence is insufficient in light of an "identification card" maintained by the sheriff that reflected plaintiff weighed but 120 pounds upon admission to the county jail.

2. Plaintiff testified that he was placed in solitary several times and that out of the five months he spent in the county jail, "better than half the time" was spent in solitary confinement. (S.F. 72–II–239). Defendant testified that he could recall plaintiff being placed in the solitary cell only once and could not recall the specific dates. No record was kept of plaintiff's confinement in the county jail.

3. State Habeas Corpus Proceeding, S.F. p. 25.

4. Deputy Sheriff Yeager testified, in terms of general practice, that a person in solitary received the same meal that was regularly served in the jail and that generally consisted of beans, potatoes, hominy, rice—some days meat loaf or stew. However, he could not remember what the meal consisted of in 1970. He testified that it could have been baloney sandwiches. Three inmates of the jail including plaintiff testified that they received only a baloney sandwich and a jug of water.

■ There is no question whether the sheriff had actual knowledge of the deplorable conditions of the solitary cell. There is an abundance of evidence from which to conclude that he did and that he personally directed his deputies to place plaintiff in the cell.[5]

Sheriff Hamilton testified that plaintiff was placed in solitary confinement as a disciplinary action for possession of hacksaw blades and for banging on the bars of his cell with a tin cup. The sheriff received a verbal report of the jail infraction from one of his deputies and directed that plaintiff be placed in solitary confinement for three days.

■ To be sure, jail officials have the duty to maintain discipline among inmates and to that end may impose reasonable sanctions as punishment. And, it appears that the present pulse of society condones solitary confinement as a mode of punishment and the courts hold that solitary confinement is not per se cruel and unusual. *E. G.,* Novak v. Beto, 453 F.2d 661, 665 (5th Cir. 1971). Solitary confinement may, however, result in cruel and unusual punishment if carried out in a manner that is "inhuman" and "violative of [the] basic concepts of [human] decency." Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L. Ed.2d 630 (1958).

■ The eighth amendment prohibits "cruel and unusual punishment."[6] Since Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), the amendment's prohibition is applicable to the states through the fourteenth amendment. An intended purpose of the Civil Rights Act was to enforce the provisions of the fourteenth amendment. Monroe v. Pape, 365 U.S. 167, 171, 81 S.Ct. 473, 5 L.Ed.2d 492, 496 (1961). 42 U.S.C. 1983[7] gives a remedy—an action at law, suit in equity, or other proper proceeding—to people deprived of constitutional rights, privileges, and immunities by an official's abuse of his position.

■ Although the framers of the Constitution gave no precise definition to the phrase "cruel and unusual punishment," it has been said that "ordinarily the terms imply something inhuman and barbarous,—torture · and the like." Weems v. United States, 217 U.S. 349, 368, 30 S.Ct. 544, 549, 54 L.Ed. 793 (1910). The basic concept underlying the eighth amendment has been articulated as "nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards." Trop v. Dulles, 356 U.S. 86, 100, 78 S.Ct. 590, 597, 2 L.Ed.2d 630, 642 (1958). Noting that a "principle, to be vital, must be capable of wider application than the mischief which gave it birth," the Court held that the eighth amendment "is not fastened to the obsolete, but may acquire meaning as public opinion becomes en-

---

5. Even if the sheriff had no actual knowledge of the conditions of the cell and did not personally place or direct his deputies to place plaintiff in the cell, he would still be liable. Hamilton knew or should have known that plaintiff was being forced to live under the conditions previously described by this court as "inhumane." The Fifth Circuit has held that under § 1983 a deputy sheriff's actions could be imputed to the sheriff when that was the law of the state involved. Lewis v. Brautigam, 227 F.2d 124 (5th Cir. 1955); *accord,* McDaniel v. Carroll, 457 F.2d 968 (6th Cir. 1972). Under Texas law (Article 5116, Vernon's Ann. Texas Revised Civil Statutes), a "sheriff may appoint a jailer to take charge of the jail, and supply the wants of those therein confined; *but in all cases the sheriff shall exercise a supervision and*

*control over the jail."* (Emphasis supplied.) *See also* Article 16.21, V.A.C.C.P.

6. The eighth amendment provides:
"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

7. 42 U.S.C. § 1983 provides:
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." R.S. § 1979.

lightened by a humane justice." Weems v. United States, *supra*, 217 U.S. at 373, 378, 30 S.Ct. at 551, 553.

In Novak v. Beto, 453 F.2d 661 (5th Cir. 1971), Judge Thornberry, cautious not to "run the risk of imposing our own personal moral code on a perhaps unready society," 453 F.2d at 665, carefully examined the cases which had previously concluded that certain prison conditions were so "base, inhuman and barbaric" that they violated the eighth amendment's prohibition.[8] His analysis led him to the recognition that "there is a common thread that runs through all these cases," that thread being "the deprivation of basic elements of hygiene." 453 F.2d at 665. Basic elements of hygiene were nonexistent in the solitary cell at the Brazos County jail at the time of plaintiff's confinement.[9]

As a legal conclusion, this court finds that during the period of time that plaintiff was confined in the solitary cell in the Brazos County jail the general conditions of the cell and treatment of plaintiff were collectively so inhumane as to violate the plaintiff's eighth amendment right to be free from cruel and unusual punishment. The court finds the evidence insufficient, however, to prove that plaintiff was denied access to counsel, that he was denied an opportunity to post bond, or that he was denied adequate medical assistance.

Defendant moved for an instructed verdict regarding liability arguing first that since the basis of this suit involves "internal discipline" the federal court should not inquire into such matters as solitary confinement, and, second, that the plaintiff's proof is insufficient to show the alleged deprivation of his civil rights. In Wright v. McMann, 387 F.2d 519 (2nd Cir. 1967), the court expressed the now prevailing view that the old cases routinely applying abstention have been passed by the events. Recognizing the older cases where the federal courts refused to review charges instituted under the Civil Rights Act and arising out of state prison disciplinary procedures, the court stated:

> Recent decisions, however, have demonstrated a sharp alteration in the judicial attitude toward these rationales and today the older cases retain little vitality. Indeed, there is no longer any question that a state prisoner may bring an action under the Civil Rights Act. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). Any lingering uncertainty over the applicability of the Eighth Amendment to the States was laid to rest by Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). And, while federal courts are sensitive to the problems created by judicial interference in the internal discipline of state prisons, in appropriate cases they will not hesitate to intervene. (Citations omitted.)

Wright v. McMann, *supra*, at 522.

In his argument that the evidence is insufficient to show cruel and unusual punishment defendant cites Novak v.

---

8. *See, e. g.*, Wright v. McMann, 387 F.2d 519 (2d Cir. 1967) [complaint alleged cell encrusted with excrement, plaintiff entirely naked, forced to sleep on concrete floor, windows open throughout subfreezing weather, no soap, towel, or toilet paper]; Hancock v. Avery, 301 F.Supp. 786 (M.D.Tenn.1969) [hole for waste, flushed irregularly by guard, no soap, towel, or toilet paper, prisoner slept naked on floor]; Holt v. Sarver, 300 F.Supp. 825 (E.D.Ark.1969) [isolation cells dirty and unsanitary, pervaded with bad odors, plain cotton mattress uncovered and dirty; conducive to spreading, and did spread, infectious diseases]; Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966) [cells not cleaned regularly, prisoner had no means to clean himself, a hole for receiving bodily wastes, no flushing mechanism]. In addition, see Gates v. Collier, 349 F.Supp. 881 (N.D.Miss.1972); Osborn v. Manson, 359 F.Supp. 1107 (D.Conn.1973).

9. Defendant's attorney announced to the court that since the filing of this suit the solitary cell has not been used and that there existed no intention to ever again use the cell as a form of punishment.

Beto, 453 F.2d 661 (5th Cir. 1971) wherein solitary confinement as implemented by the Texas Department of Corrections was held not to be cruel and unusual punishment even though the cells were dimly lighted, there was limited bedding, and minimal food was provided. However, the solitary confinement conditions found in *Novak* are easily distinguishable from those found in this case. On pages 665–666 of the *Novak* opinion Judge Thornberry points out:

> [T]he prisoners in the TDC solitary confinement cells *are deprived of none of the basic elements of hygiene*. It is uncontradicted that solitary cells are scrubbed by the guards each time the prisoner leaves to bathe, which occurs at least three times a week. *The cells are identical to the regular cells of the TDC in size and facilities; they contain flush toilets, a drinking fountain, and a bunk. The prisoner is supplied with toilet paper, a toothbrush and toothpaste.* (Emphasis added.)

Another oft-cited case relied upon by defendant is Sostre v. McGinnis, 442 F. 2d 178 (2nd Cir. 1971). It, too, is distinguishable in that the cells in *Sostre* had toilets and running water and the prisoner was permitted an hour per day of exercise in a courtyard open to the fresh air.[10] The court in *Sostre* emphasized these two factors in concluding that the Constitution was not violated. *See* Osborn v. Manson, 359 F.Supp. 1107, 1111 (D.Conn. 1973).

10. When an admission was requested, pursuant to Rule 36, F.R.Civ.P., that a prisoner in solitary has no recreational opportunities or access to fresh air, defendant answered "The prisoner in solitary does not need recreational opportunities, and receives forced ventilated air." (Answers of defendant J. W. Hamilton to plaintiff's request for admissions.)

11. This section provides in material part:
"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

## JURISDICTION

### 1. Diversity of Citizenship

■ Defendant attacks this court's jurisdiction on three grounds. By his amended answer, defendant contends this court lacks jurisdiction because there is no diversity of citizenship. Although diversity of citizenship may be the basis of jurisdiction in a civil rights suit, Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), jurisdiction is asserted and found in this case under 42 U.S.C. § 1983, which is set out above, and 28 U. S.C. § 1343.[11]

### 2. Amount in Controversy

■ It is also contended that the court lacks jurisdiction because "the monetary claims alleged and proved do not meet the statutory amounts in controversy as required by 28 U.S.C. § 1332." Section 1332 pertains to diversity of citizenship jurisdiction and requires the amount in controversy to exceed "the sum or value of $10,000, exclusive of interest and costs." As stated above, jurisdiction in this case is not based upon diversity, rather, it is based upon a claim by plaintiff, under 28 U.S. C. § 1343(3), that he has been denied "under color of . . . state law" a federally-protected right. Section 1343 (3) gives this court jurisdiction without regard to amount in controversy. *See* Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L. Ed.2d 424 (1972). Moreover, Mr. Justice Douglas, writing for the majority in Monroe v. Pape, 365 U.S. 167, 81 S.Ct.

\* \* \* \* \*

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

473, 5 L.Ed.2d 492 (1961), analyzed the legislative history of the Civi Rights Act and pointed out that Senator Thurman of Ohio spoke of the purpose of the legislation thusly:

It authorizes any person who is deprived of any right, privilege, or immunity secured to him by the Constitution of the United States, to bring an action against the wrongdoer in the Federal courts, and that without any limit whatsoever as to the amount in controversy.

Moreover, the basis of this suit certainly meets the old test of "inherently incapable of pecuniary valuation." *See* Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

### 3. *Res Judicata—Collateral Estoppel*

Finally, defendant attacks this court's jurisdiction on the ground that the doctrine of *res judicata* and collateral estoppel preclude this court from relitigating the issues decided in the state habeas corpus proceeding.

Prior to the civil rights hearing in this court, a conclusion of law was made in a state habeas hearing that "the defendant [plaintiff here] was not mistreated while incarcerated in the Brazos County Jail." The issue presented in this § 1983 damage suit is whether the conditions of plaintiff's confinement in the solitary confinement cell of the Brazos County jail amounted to cruel and unusual punishment as proscribed by the eighth amendment. Defendant argues that the finding of no mistreatment by the state habeas court precludes the relitigation of the related issue of cruel and unusual punishment in this court.

The doctrine of collateral estoppel by judgment was described recently in Parker v. McKeithen, 488 F.2d 553 (5th Cir. 1974):

It is a fundamental principle of jurisprudence that material facts or questions which were in issue in a former action, and were there admitted or judicially determined, are conclusively settled by a judgment rendered there-

in, and that such facts or questions become res judicata and may not again be litigated in a subsequent action between the same parties or their privies, regardless of the form the issues may take in the subsequent action, whether the subsequent action involves the same or a different . . . cause of action, subject matter, claim, or demand, as the earlier action. In such cases, it is also immaterial that the two actions are based on different grounds, or tried of different theories, or instituted for different purposes, and seek different relief.

488 F.2d at 557–558, quoting from American Jurisprudence, Judgments § 371. Thus, defendant argues that the finding that plaintiff was not mistreated is tantamount to a finding that his treatment was not cruel and unusual. Then, applying the doctrine of collateral estoppel, the issue of cruel and unusual punishment is precluded from relitigation by this court, and this court "has no jurisdiction to determine constitutional issues already submitted to and determined by a state court." Paul v. Dade County, Florida, 419 F.2d 10 (5th Cir. 1969).

The rationale of this no jurisdiction holding is that the federal district court has only original jurisdiction, not appellate jurisdiction; it cannot be used as "a form of direct federal district court review of the state decision." Brown v. Chastain, 416 F.2d 1012, 1013 (5th Cir. 1969).

██ ██ At first blush the argument sounds of merit, but upon closer analysis, the argument falls under its own weight and it becomes apparent that this court does have jurisdiction and that the doctrines of *res judicata* and collateral estoppel are inapplicable.

To begin with, this court is not convinced that the principles of *res judicata* and collateral estoppel should ever operate to preclude an issue decided in a state habeas corpus hearing from being relitigated in a federal § 1983 civil

rights suit. This question has not been decided by the Supreme Court, although they have discussed it. Mr. Justice Stewart, speaking for the majority in Preiser v. Rodriquez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) spoke in dicta of the question as he noted:

> Principles of *res judicata* are, of course, not wholly applicable to habeas corpus proceedings. 28 U.S.C. § 2254(d). See Salinger v. Loisel, 265 U.S. 224, 230, 44 S.Ct. 519, 521, 68 L. Ed. 989 (1924). Hence, a state prisoner in the respondents' situation who has been denied relief in the state courts is not precluded from seeking habeas relief on the same claims in federal court. On the other hand, *res judicata* has been held to be fully applicable to a civil rights action brought under § 1983. [Citations omitted—it should be noted that none of the cases cited dealt specifically with a state judgment in a habeas corpus proceeding operating to preclude relitigation of the same federal question in a § 1983 damage action.] Accordingly, there would be an inevitable incentive for a state prisoner to proceed at once in federal court by way of a civil rights action, lest he lose his right to do so."

411 U.S. at 497, 93 S.Ct. at 1840, 36 L. Ed.2d at 454–455. But Mr. Justice Brennan hastened to point out in his dissent:

> . . . In any case, we have never held that the doctrine of *res judicata* applies, in whole or in part, to bar the relitigation under § 1983 of questions that might have been raised, but were

not, or that were raised and considered in state court proceedings. The Court correctly notes that a number of lower courts have assumed that the doctrine of *res judicata* is fully applicable to cases brought under § 1983. But in view of the purposes underlying enactment of the Act—in particular, the congressional misgivings about the ability and inclination of state courts to enforce federally protected rights, . . . that conclusion may well be in error.

411 U.S. at 509, n. 14, 93 S.Ct. at 1846. This court is not of the opinion that the question was settled in the recent decision of Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), where, after stating *"Preiser* expressly contemplated that claims properly brought under § 1983 could go forward while actual restoration of good-time credits is sought in state proceedings," Mr. Justice White, speaking for the majority, noted in dicta: "One would anticipate that normal principles of res judicata would apply in such circumstances." *Id.* 418 U.S. at 554, 94 S.Ct. at 2974.

Turning to decisions of the lower federal courts, we find that the principles of *res judicata* have been applied to bar relitigation under § 1983 of questions previously determined in a state civil tort action,[12] and of questions previously determined in a state criminal trial,[13] but for whatever the significance, this court is not aware of a case that has specifically held a state court's adjudication in a habeas corpus proceeding to bar relitigation of the same federal question in a § 1983 damage suit.[14]

---

12. *See, e. g.,* Brown v. Chastain, 416 F.2d 1012 (5th Cir. 1969); Parker v. McKeithen, 488 F.2d 553 (5th Cir. 1974); Hyman v. Regenstein, 258 F.2d 502 (5th Cir. 1958); Lackawanna Police Benevolent Association v. Balen, 446 F.2d 52 (2d Cir. 1971).

13. *See, e. g.,* Shank v. Spruill, 406 F.2d 756 (5th Cir. 1969); Moran v. Mitchell, 354 F. Supp. 86 (E.D.Va.1973); Lackawanna, *supra*; Rosenberg v. Martin, 478 F.2d 520 (2d Cir. 1973) (Friendly, J.)

14. Although Judge Pollack, in his exhaustive analysis of the principles of *res judicata* in

Thistlethwaite v. City of New York, 362 F. Supp. 88 (S.D.N.Y.1973), stated by footnote, "[f]indings made in a post-conviction relief proceeding, however, will be binding in a subsequent civil suit. See Rosenberg v. Martin, 478 F.2d 520 (2d Cir. 1973); Williams v. Halperin, 360 F.Supp. 554 (S.D. N.Y.1973) (Pollack, J.)" both the *Rosenberg* and *Williams* cases had the additional factor that the question barred from relitigation in the § 1983 action had also been decided in a federal habeas corpus proceeding.

However, aware of the physical limitations in the area of *stare decisis* research, I hesitate to say there are no such cases. Rather, without deciding the question whether the doctrines of *res judicata* and collateral estoppel should ever apply to preclude relitigation in a § 1983 suit of issues previously determined in a state habeas corpus proceeding, I find that under the particular circumstances of this case the doctrines are inapplicable under traditional standards.

First, this court did not lose jurisdiction of the civil rights claim when it severed the habeas claim for state exhaustion. This court is exercising its original jurisdiction in deciding the civil rights claim of cruel and unusual punishment; it is not a legitimate characterization to say this court is being used as "a direct federal district court review of the state decision." In Thistlethwaite v. City of New York, 362 F.Supp. 88 (S.D.N.Y.1973), it was stated:

> Where a litigant *affirmatively* decides to launch his constitutional battle in a state civil suit and pursues that battle through the state court system, he has chosen to bypass the opportunity to begin a federal civil rights suit in the district court. [Citations omitted.]
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> However, an actual election of the state forum must appear on the record before the litigant is denied entry to the federal district court. (Emphasis added.)

362 F.Supp. at 92.

Plaintiff did not "affirmatively" decide to "launch his constitutional battle" in the state court; he did not elect to use the state forum; he filed his suit originally in this court. More importantly, his constitutional claim of cruel and unusual punishment was never presented to the state court. Although his habeas claim—that his plea of guilty was coerced—was severed and eventually found its way to the state court, plaintiff never relinquished his right to have the federal court pass upon his civil rights damage suit. By way of analogy, compare the abstention case of England v. Louisiana Medical Examiners, 375 U. S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964) wherein it was stated:

> Thus in cases where, but for the application of the abstention doctrine, the primary fact determination would have been by the District Court, a litigant may not be unwillingly deprived of that determination. [Footnote omitted.] The possibility of appellate review by this Court of a state court determination may not be substituted against a party's wishes, for his right to litigate his federal claims fully in the federal courts.

375 U.S. at 417, 84 S.Ct. at 465. The Court thereafter noted:

> . . . We are confident that state courts, sharing the abstention doctrine's purpose of "furthering the harmonious relation between state and federal authority," . . . will respect a litigant's reservation of his federal claims for decision by the federal courts.

375 U.S. at 422, n. 12, 84 S.Ct. at 468.

If this court were to agree with defendant that the state habeas court incidently decided the cruel and unusual question although it was not presented to the court (neither was it argued or briefed) and it was not necessary to its determination of the issue that was presented, then the effect of this would be to unwillingly deprive plaintiff of his right to litigate his federal claim fully in this federal court.

For still another reason, and probably the most significant, collateral estoppel is inapplicable under the circumstances present here. None of the traditional requirements for the application of the doctrine of collateral estoppel are present here. Recently, in Port Arthur Tow. Co. v. Owens-Illinois, Inc., 492 F.2d 688 (5th Cir. 1974) the court listed

three of the traditional requirements for the application of the doctrine as:

> (1) [T]he issue to be concluded must be identical to that involved in the prior action; (2) in the prior action the issue must have been "actually litigated"; and (3) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment.

The issues in the state habeas hearing were (1) "whether mistreatment by the Sheriff and other officials when he was incarcerated in the Brazos County Jail awaiting trial caused him to plead guilty" and (2) whether "his attorneys were incompetent" for various reasons.[15] The issue in this court is whether the conditions of plaintiff's confinement constituted cruel and unusual punishment. The issues are not identical.

The issue of cruel and unusual punishment not being presented to the state habeas court, it was neither argued or briefed. The issue was not "actually litigated." Although the state court concluded that plaintiff "was not mistreated while incarcerated in the Brazos County Jail," that finding must be read in light of the issue that confronted the court—whether the mistreatment caused him to plead guilty involuntarily. Read in this light, the conclusion means that there was no mistreatment in the sense of coercion, or that there was no mistreatment which would cause him to plead guilty involuntarily.

Finally, even if this court agreed with the tenuous contention that the finding of no mistreatment constituted a finding of no cruel and unusual punishment, collateral estoppel would still be inapplicable because such a finding would not have been "necessary and essential to the resulting judgment" of the state court that his plea was voluntarily entered. Therefore, assuming arguendo, that the doctrine of *res judicata* may ap-

ply to bar relitigation under § 1983 of questions that were previously determined in a state habeas hearing, for the foregoing reasons, the doctrines of *res judicata* and collateral estoppel are inapplicable under the circumstances of this case.

### IMMUNITY

 Defendant's argument that he is immune from suit and liability is rejected. A sheriff enjoys no more immunity than a police officer when his conduct, under color of law, is wrongful under 42 U.S.C. § 1983. *Cf.* Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L. Ed. 288 (1967); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Hampton v. City of Chicago, Cook County, Illinois, 484 F.2d 602 (7th Cir. 1973). The language of § 1983 which says "every person" includes a sheriff. Only those whose immunity was "solidly established at common law"[16] are immune from suit under § 1983. Pierson v. Ray, *supra.*

 In an attempt to bring this case within the folds of a quasi-judicial immunity setting (*see* Hampton v. City of Chicago, Cook County, Illinois, *supra*; Robichaud v. Ronan, 351 F.2d 533 (9th Cir. 1965)), defendant argues in his brief in support of his motion for directed verdict on damages that he acted in furtherance of a court order placing plaintiff in his custody and his duty to insure plaintiff's availability at trial. He contends that he placed plaintiff in solitary confinement to prevent him from escaping and so that he would not receive from various sources the tools necessary to effectuate an escape. Thus, he argues, he acted merely as an arm of the court and should be afforded quasi-judicial immunity. Defendant's position that he placed plaintiff in solitary confinement as a disciplinary action for a jail rule infraction makes his qua-

---

15. Findings of Fact and Conclusions of Law, Ex parte Vincin Campise v. W. J. Estelle, Jr., Cause No. 10,108, District Court of Brazos County, 85th Judicial District.

16. *See* Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); Pierson v. Ray, *supra.*

si-judicial claim incredible. This court finds as a fact that defendant placed plaintiff in the solitary cell as a disciplinary action and not as a means to prevent an escape. Accordingly, as a conclusion of law, this court finds that the defendant is not entitled to quasi-judicial immunity.

## GOOD FAITH AND PROBABLE CAUSE

■ This is not to say, however, that the sheriff is not entitled to raise the defense of "good faith and probable cause," which he does. However, as was pointed out in *Hampton, supra,* "the claim of immunity must not be confused with the defense of good faith." 484 F. 2d at 607. The defense, historically applied to tort liability of police officers charged with making a false arrest, was recognized by the Supreme Court and held to be available in certain actions under § 1983. In Pierson v. Ray, *supra,* Mr. Chief Justice Warren, speaking for the majority and explaining Monroe v. Pape, *supra,* said:

> In rejecting this argument [the argument that was rejected was the one advanced by the police officers that their activities were so plainly illegal under state law that they did not act "under color of any statute, ordinance, regulation, custom or usage, of any State or Territory" as required by § 1983] we in no way intimated that the defense of good faith and probable cause was foreclosed by the statute.
>
> \* \* \* \* \* \*
>
> As we went on to say in the same paragraph, § 1983 " 'should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.' " 365 U.S., at 187, 81 S.Ct. at 484 [5 L.Ed.2d at 505]. Part of the background of tort liability, in the case of police officers making an arrest, is the defense of good faith and probable cause.

> We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983.

386 U.S. at 556–557, 87 S.Ct. at 1219, 18 L.Ed.2d at 296.

However, as Judge Goldberg said in Whirl v. Kern, 407 F.2d 781 (5th Cir. 1969):

> As we read Pierson v. Ray, good faith and probable cause are defenses to an arrest not because of any language in § 1983 but because § 1983 must be read in a manner consistent with the background of tort liability.
>
> \* \* \* \* \* \*
>
> The instruction that § 1983 is to be read against the background of tort liability does not seem to us a directive that "good faith" is a defense to all actions under the Civil Rights Act. Rather Pierson impressed the common law of torts into the service of the Civil Rights Act, and thereby made "good faith" a defense to a suit under § 1983 only where it is *also* a defense "under the prevailing view [of tort law] in this country." 386 U.S. at 555, 87 S.Ct. at 128, 18 L.Ed.2d at 295.

407 F.2d at 788, 791.

With this backdrop, this court is not convinced that the good faith defense is available to a sheriff who chooses to discipline a citizen in his custody cruelly and unusually, be it his standard punishment or not. This circuit found a distinction between false arrest cases and false imprisonment cases with regard to the availability of the good faith defense in the *Whirl* case.

Part of the court's rationale in Whirl was that "a jailer, unlike a policeman, acts at his leisure. He is not subject to the stresses and split second decisions of an arresting officer . . ." *Id.* at 792. Likewise, this court is inclined to

find a distinction between the position of the policeman making an arrest [17] and a jailer confronted with the decision of what punishment he should administer to an inmate for a jail rule infraction.

But, even assuming that probable cause and good faith is an available defense in this case, this court finds that defendant did not act in good faith. In order to sustain the defense of probable cause and good faith in the context of this case, this court would have to find that defendant had probable cause to discipline plaintiff and, second, that the defendant reasonably believed in good faith that the punishment he elected to administer to plaintiff was not cruel and unusual. Although it is believed that under the circumstances the defendant had probable cause to discipline plaintiff, the court finds specifically that defendant could not have reasonably believed in good faith that the conditions of the solitary cell complied with standards of human decency or even complied with the statutory standards of Texas law.[18] Defendant's "good faith" defense, whether aimed at liability or damages, is overruled.

## STATUTE OF LIMITATIONS

The confinement which forms the basis of plaintiff's complaint occurred in April of 1970 while he was awaiting trial. Plaintiff did not file his civil rights suit until February 25, 1972, over two years from the date of the questioned confinement. Defendant contends that the claim is thus barred by the Texas statute of limitations. True, the statute of limitations for an action such as this, under Texas law, is two years. *See* Vernon's Ann.Civ.St. art. 5526. However, plaintiff's cause of action accrued while he was imprisoned in the county jail and he has been continuously imprisoned from that date through the date he filed his civil rights suit. Imprisonment under Texas law is considered a disability and the statute of limitations does not begin to run until after the disability is removed. Vernon's Ann.Civ.St. art. 5535.[19] Therefore, plaintiff's suit is not barred by limitations. *Compare* Blum v. Elkins, 369 S.W.2d 810 (Tex.Civ.App.—1963).

## DAMAGES

A recess was declared at one point to allow counsel for both parties to produce evidence on the issue how con-

---

17. "A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." Whirl v. Kern, *supra* at 790, quoting from Pierson v. Ray, *supra* 386 U.S. at 555, 87 S.Ct. 1213.

18. "The Commissioners Court shall provide safe and suitable jails for their respective counties, and shall cause the same to be maintained in good sanitary condition at all times, properly ventilated, heated and lighted; structurally sound, fire resistant and kept in good repair. Furthermore, they shall cause the jails in their respective counties to be kept in a clean and healthy condition, provided with water of safe quality and ample quantity and sewer disposal facilities in accordance with good sanitary standards, and provided with clean, comfortable mattresses and blankets, sufficient for the comfort of the prisoners, and that food is prepared and served in a palatable and sanitary manner

and according to good dietary practices and of quality to maintain good health.

\* \* \* \* \*

"The term 'safe and suitable jails' is further defined to mean jails which provide adequate facilities for maintaining proper standards in sanitation and health. Each cell designed for one (1) prisoner only shall be provided with a water closet and a combination lavatory and drinking fountain, table and seat." Vernon's Ann.Civ. St. art. 5115.

19. Art. 5535 provides:
"If a person entitled to bring any action mentioned in this subdivision of this title be at the time the cause of action accrues either a minor, a married person under twenty-one years of age, a person imprisoned or a person of unsound mind, the time of such disability shall not be deemed a portion of the time limited for the commencement of the action and such person shall have the same time after the removal of his disability that is allowed to others by the provisions of this title."

finement in the solitary cell under the conditions as they have been found affected the plaintiff both physically and psychologically. At the subsequent hearing plaintiff failed to produce probative evidence on the subject. The testimony of plaintiff's only expert witness was stricken upon a meritorious motion of defendant. Thereafter, on the question of damages, plaintiff rested. An inquiry was made as to what testimony or evidence defendant intended to present. Defendant's proffer was that the evidence would show that plaintiff suffered no injury either physically or psychologically from his confinement in the solitary cell. From the bench the finding was made that plaintiff was entitled to only ten dollars actual damages. Plaintiff had also sought damages for lost wages while confined in the county jail. However, since he was in custody pursuant to a lawful order of the District Court of Brazos County, he cannot recover damages for lost wages. Speaks v. McGregor, 355 F.Supp. 1129, 1132 (W. D.Va.1973).

■■ Nevertheless, plaintiff is entitled to punitive damages. To recover punitive damages it is not necessary that actual damages be shown. If a claim of a violation of a constitutionally guaranteed right be sustained by sufficient proof, nominal damages may be presumed and such may in appropriate circumstances support an award of exemplary damages. Tracy v. Robbins, 40 F.R.D. 108, 113 (D.S.C.1966); Basista v. Weir, 340 F.2d 74 (3d Cir. 1965). *See also* Bradley v. School Board of City of Richmond, Virginia, 324 F.Supp. 401, 402 (E.D.Va.1971).

It is sufficient for the plaintiff to show either that the defendant acted "under color of [a] statute, ordinance, regulation, custom, or usage of any State or Territory," with actual knowledge that he was violating a right "secured by the Constitution and laws," *or* that the defendant acted with reckless disregard of whether he was thus violating such a right. Cf. C. McCormick, Handbook on the Law of Damages § 79 (1935).

Adickes v. Kress & Co., 398 U.S. 144, 233, 90 S.Ct. 1598, 1642, 26 L.Ed.2d 142, 197 (1970) (Brennan, concurring in part and dissenting in part). Sharing the opinion that in certain circumstances "the prospect of substantial punitive damages may be the most effective means to persuade . . . [jailors] to respect constitutional rights," [20] and finding that the defendant here acted with a reckless disregard of whether he was violating plaintiff's constitutionally protected right, this court concludes that plaintiff is entitled to recover from defendant punitive damages in the amount of $1,500.

■ Further, mindful that where federally protected rights have been invaded, "it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief," [21] attorney's fees in the amount of $750 is awarded to plaintiff. The conditions of the solitary confinement cell in the Brazos County jail, although violative of Article 5115 of the Texas Revised Civil Statutes and although clearly offensive to human dignity, have long existed, perhaps as a result of public and official apathy; and, although this court hesitates to use the magic words "unreasonably and obdurately obstinate," [22] it appears from the record that but for the institution of this suit, the conditions of the Brazos County jail would remain as they were in 1970. In this sense, plaintiff and his private attorney have aided in effectuating important congressional and public policies. Under the "private attorney general" theory, attorney's fees are awarded. *See* Gates v. Collier, 489 F.2d 298, 300, n. 1 (5th Cir. 1973); Cornist v. Richland Parish School Bd., 495 F.2d

---

20. *Id.* 398 U.S. at 234, 90 S.Ct. at 1643.

21. Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946).

22. Gates v. Collier, 489 F.2d 298, 300 (5th Cir. 1973).

189 (5th Cir. 1974); Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Cooper v. Allen, 467 F.2d 836 (5th Cir. 1972). *See generally* Horton v. Lawrence County Board of Education, 449 F.2d 793 (5th Cir. 1971); Lee v. Southern Home Sites Corp., 444 F.2d 143 (5th Cir. 1971).

In summary then, defendant, while acting under color of law, subjected plaintiff to cruel and unusual punishment in violation of the eighth amendment. As a result of this violation, plaintiff is entitled to recover from defendant $10.00 actual damages, $1,500.00 punitive damages, and $750.00 in attorney's fees.